IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| **BRUCE WILLIAMS** ) | |
| ) | **Cause Number: 4:21-cv-00324** |
| **Plaintiff,** ) | |
| ) | |
| v. ) | |
| ) | |
| **CIGNA HEALTH AND LIFE INSURANCE** ) | |
| **COMPANY** ) | |
| Serve: Director of Insurance ) | |
| 301 W. High Street, Room 530 ) | |
| Jefferson City, MO 65101 ) | |
| ) | |
| **Defendant.** ) | |

# COMPLAINT
## EMPLOYMENT RETIREMENT INCOME SECUIRTY ACT

**COMES NOW** Plaintiff J.W. by and through his Legal Guardian Bruce Williams and undersigned counsel, pursuant to the Employee Retirement Income Security Act of 1974, as amended 29 U.S.C. §1001 *et. seq.*, and for his cause of action against Defendant Cigna Behavioral Health, Inc., respectfully states the following:

1.  Bruce Williams brings this action against Defendant Health and Life Insurance Company. ("Cigna") for damages caused by the Defendant's breach of statutory, contractual, and fiduciary obligations and violations of the Employee Retirement Income Security Act of 1974, as amended 29 U.S.C. § 1001 *et. seq.* ("ERISA").

2.  This is an action brought pursuant to 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331. Under 29 U.S.C. §1132(f), the Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

3. Venue is proper in this District pursuant to 29 U.S.C. §1132(e)(2), in that the subject employee welfare benefit plan and employee insurance program are administered in this District, the breaches of duty herein alleged occurred in this District, and Defendants reside or are found in this District.

**Parties**

4. Plaintiff's child J.W. was at all times relevant a minor.

5. Mr. Bruce Williams is an individual residing in St. Louis County, in the Eastern District of Missouri. Mr. Williams is an employee of Barry-Wehmiller Companies, Inc. and is a vested participant in a Group Insurance Policy which provides an employee benefit plan within the meaning of 29 U.S.C. § 1132(a).

6. Defendant Cigna provides coverage for certain employees of Barry-Wehmiller Companies, Inc. under an employee welfare benefit plan ("Plan") within the meaning of 29 U.S.C. § 1002(1). Specifically, Cigna provides for Residential Mental Health Treatment for Children and Adolescents, among other benefits for Barry-Wehmiller Companies, Inc.

7. Mr. Williams is a participant in the ERISA medical benefits policy that is administered by Cigna, and his dependent child, J.W., is a beneficiary of those medical benefits under the Plan. As such, Defendant owes fiduciary, contractual, and statutory duties and obligations to Mr. Williams consistent with ERISA, the Policy, and interpretive case law.

8. Cigna is an insurance company incorporated in Pennsylvania and is doing business in Missouri under a license to do business as a Foreign Insurance Company.

9. Cigna administers and pays benefits under the terms of the Residential Mental Health Treatment for Children and Adolescents plan and is a fiduciary within the meaning of 29 U.S.C. §1002(21) and 1102.

10.     Barry-Wehmiller Companies, Inc. serves as the plan administrator and sponsor under the meaning of 29 U.S.C. § 1002(16).

**Factual Allegations**

11.     J.W. carries a medical health diagnosis of a generalized anxiety disorder, an unspecified depressive disorder, an oppositional defiant disorder, an unspecified neurodevelopmental disorder, parent-child relational problems, and an academic or educational problem.

12.     Anxiety and Mood Disorders are recognized in the Diagnostic and Statistical Manual – V (DSM-V) as psychiatric disorders and are categorized as "Axis I" diagnosis. Furthermore, Conduct Disorders, such as oppositional defiance disorder, are recognized by the Diagnostic and Statistical Manual and are categorized as an "Axis I or II" diagnosis.

13.     Symptomatically, J.W. is oppositional, actively resistant, impulsive, externalizes and blames others, exhibits attention seeking behaviors, and suffers from suicidal behavior.

14.     J.W.'s psychiatric history has included evolving instability of mood with behavioral dysregulation in the form of aggressive behavior and poor impulse control. His presentation is also suggestive of prominent and pervasive anxiety, insecurity, and episodic depressive symptoms.

15.     J.W.'s history is also consistent with an oppositional defiance disorder, further complicated by executive function weaknesses.

16.     J.W. struggles with managing overwhelming emotions and acts out in aggressive and manipulative ways to have needs met and presents disrupted attachment symptoms.

17. Additionally, J.W. has difficulty managing overwhelming thoughts, worries about others liking him, or being rejected. He has difficulty concentrating, avoids activities that are deemed too difficult, and is easily distracted.

18. J.W. has further difficulties following rules and consequences and can become physically and verbally aggressive towards his parents to the point that he is "holding them hostage."

19. On February 05, 2018, J.W. was checked into Evoke Wilderness, a Second Nature Entrada Therapeutic outdoor youth treatment program, for aggression and violence.

20. After making repeated efforts to elope from the program, physical violence to the staff, and threats of self-harm, J.W. left Evoke Wilderness on March 02, 2018.

21. That same day, on March 02, J.W. was checked into ViewPoint Center, a psychiatric assessment center and treatment facility for adolescents, by his parents for physical violence and threats of self-harm.

22. J.W. was checked out of the ViewPoint Center on May 05, 2018.

23. On May 10, 2018, until May 31, 2019, J.W. was checked into the residential treatment center at Change Academy at Lake of the Ozarks.

24. During his time at ViewPoint, J.W. underwent various psychiatric testing with Dr. Jordan Rigby.

25. J.W.'s executive function scores suggested functioning limitations. Further testing results showed that J.W. struggled with higher-order problem solving, planning, adaptability, inhibitory control, and reasoning.

26. Dr. Rigby opined that the deficiencies mentioned above are neurodevelopmentally related, meaning they are a part of J.W.'s presentation and have been since he was young.

27.	Dr. Rigby concluded that at a minimum, a therapeutic resident school *is necessary* as his emotional problems have impacted his learning process, and therefore, he will struggle to access information or benefit academically without a therapeutic aspect integrated into his educational programming.

28.	Additionally, Dr. Rigby concluded that J.W. should be required to continue a multidisciplinary level of services addressing his psychiatric, psychological, and neurodevelopmental concerns. It was recommended that J.W. be *closely* monitored by a primary care physician and behavioral specialists.

29.	Dr. Rigby stated that at a minimum, a therapeutic resident school is *necessary* as emotional problems have impacted his learning process, as in their opinion, J.W. will struggle to access information or benefit academically without a therapeutic aspect integrated into his educational programming.

30.	The Plan's medical coverage includes mental illness and substance abuse services. Included in the Policy's coverage is Residential Mental Health Treatment for Children and Adolescents, which requires treatment at "a facility that is either a stand-alone mental health facility or a physically and programmatically-distinct unit within a facility licensed for this specific purpose with 7-days per week, 24-hour supervision and monitoring." The treatment must be focused on stabilization and improvement of functioning and reintegration with parents/relatives or guardians."

31.	Benefits under the Plan are payable for medically necessary services, i.e., services rendered for the diagnosis or treatment of a condition that is generally accepted as necessary and appropriate according to the prevalent medical care practice standards.

32. Medical records show that the treatment provided to J.W. at the various residential programs he participated in led to measurable clinical improvements in the acute symptoms and behaviors that led to J.W.'s admission and a progression toward discharge from the present level of care. However, due to J.W.'s violent tendencies and self-harm, they are not sufficiently stabilized to be safely and effectively treated at a less restrictive level of care.

33. It is therefore likely that J.W. is currently at imminent risk of causing bodily harm to themselves or someone else due to a psychiatric illness as evidenced by their current expression of suicidal intent and the threat of violence towards others.

34. Further, J.W.'s violent, impulsive, and unpredictable behavior is likely to harm the individual or someone else without 24-hour observation and treatment, including the possible use of seclusion or restraints in a secured setting.

35. J.W's continued stay at these Residential treatment centers was not to provide a safe and structured environment but medically necessary to improve the symptoms of his multiple psychiatric diagnoses.

36. Mr. and Mrs. Williams are involved to the best of their ability in the treatment and discharge planning process of J.W.

37. Cigna denied benefit coverage under the Plan as requested by Mr. Williams on behalf of J.W. for services rendered by:

    a) the Evoke Wilderness program from February 05, 2018 to March 02, 2018;

    b) Viewpoint Center from March 03, 2018, to May 09, 2018; and

    c) Change Academy at Lake of the Ozarks from May 10, 2018, to May 31, 2019.

38. J.W. appealed these adverse determinations, requesting an independent external reviewer to examine the denials for services rendered at the Viewpoint Center and the Change Academy.

39. On March 13, 2019, MCMC, an external psychiatric claims reviewer, conducted a review of J.W's coverage request for service rendered at the ViewPoint Center. The psychiatrist never met with J.W.

40. The MCMC reviewer determined that services rendered by Viewpoint Center were not medically necessary, as J.W. had no objectively noted behavior, was engaged in his treatment plan and was not displaying violence towards others or himself.

41. However, records from ViewPoint sent into MCMC for review indicate that on:

   a) On March 10, 2018, J.W. informed staff of his intention to commit suicide.

   b) On March 14, 2018, J.W. was placed in a therapeutic hold for fleeing the building. He was escorted back to ViewPoint by police and subsequently placed out of the community.

   c) On March 15, 2018, J.W. became upset, grabbed a chair from the shared living space, and began walking down the hall with the intent to break through the glass door at the end of the hallway. Due to aggressive posturing, he was placed in a therapeutic hold.

   d) On March 16, 2018, when an incident occurred between another patient and staff, J.W. decided to jump staff from behind and became aggressive. Staff initiated a restraint due to Joe's aggressiveness.

e) On March 19, 2019, J.W. reported to the nurse that he had placed his finger against the door-frame of his room and then had used his left fist to slam his right pinky finger with the intention to break it.

f) On April 10, 2018, J.W. attempted to break his pinky finger. He began to bite his finger and bend it backward after receiving "bad news."

g) On April 12, 2018, there was an altercation between J.W. and another patient.

h) On April 18, 2018, J.W. was brought to nursing staff stating that he tried to drown himself in the bathroom toilet water today after his social group class. J.W. admitted that the water was not deep enough, but then he argued that "he would find toilet water that could possibly kill him."

42. On April 22, 2019, MES, a peer review service, conducted a review of J.W's coverage request for service rendered at the Change Academy. The psychiatrist never met with J.W.

43. The MES reviewer determined that services rendered by Viewpoint Center were not medically necessary, as J.W.'s records indicated that he did not show disruptive behaviors that would have presented an imminent danger or required physical restraint or seclusion.

44. Despite having medical records that showed the contrary, Cigna upheld its previous denials based on the independent reviewers' information.

45. Despite providing substantial evidence that J.W. that residential treatment programs are medically necessary under the terms of the Plan for Acute Inpatient Mental Health, Cigna has denied, and continues to deny, J.W. the benefits coverage and any other disability benefits since February 05, 2018.

46. At all relevant times, J.W. has been under the care of licensed medical doctors.

## COUNT I
## WRONGFUL DENIAL OF BENEFITS PURSUANT TO 29 U.S.C § 1132 (a)(1)(b)
## VIEWPOINT CENTER

47. Plaintiff incorporates by reference paragraphs 1 through 46 as though fully set therein.

48. Cigna breached its contractual, fiduciary, and statutory obligations to J.W. in its administration of the Policy with its denials of coverage for services rendered at the Viewpoint Center.

49. The Defendant's breaches include but are not necessarily limited to, the following:

    (a) Failing and refusing to authorize medically necessary treatment;

    (b) Failing and refusing to pay for medically necessary treatment;

    (c) Failing and refusing to follow APA guidelines in reviewing treatment authorization requests;

    (d) Failing and refusing to follow the applicable best practices in reviewing treatment authorization requests;

    (e) Using unqualified and improperly credentialed reviewers to consider authorization requests and appeals of authorization denials;

    (f) Applying erroneous and irrelevant standards in considering authorization requests and appeals of authorization denials;

    (g) Engaging in a pattern of conduct and behavior that discouraged, frustrated, limited and denied J.W. the benefits, and medically necessary treatment to which they were entitled;

    (h)    Employing a scheme that denied J.W. treatment and benefits to which they were entitled by rendering as moot or meaningless any determination or opinion of reviewers supporting the necessity of a higher level of treatment due to the existence of a broad policy supporting or requiring denials of authorization irrespective of J.W.'s medical needs or case specifics;

    (i)    Failing to administer the Policy in the interests of Policy beneficiary; and

    (j)    Via all its actions, depriving J.W. of the benefits they were entitled to under the policies at issue and applicable law.

50.    Plaintiff has exhausted all administrative remedies required under ERISA

51.    Cigna's actions in failing to provide coverage, authorize treatments and pay benefits for the treatments provided to J.W. violated the terms of the Policy.

52.    In addition, Cigna breached its fiduciary duties when it failed to comply with its obligations under 29 U.S.C. § 1104 and 29 U.S.C. § 1133 to act for the exclusive purpose of providing benefits to Policy participants and beneficiaries when its agents failed to provide a full and fair review of J.W. denied claims.

53.    The actions of Cigna as outlined above violated ERISA and constitute a breach of the terms and provisions of the Policy establishing the parties' rights and liabilities.

54.    The actions of Cigna, as outlined above, has caused damage to J.W. in the form of denial of payment for medical services rendered to them.

55.    Cigna IS responsible to pay J.W.'s benefits due under the terms of the Plan, Together with prejudgment interest, attorney fees and costs pursuant to 29 U.S.C. § 1132(g)(1) to the date of payment of the unpaid benefits.

**COUNT II**
**WRONGFUL DENIAL OF BENEFITS PURSUANT TO 29 U.S.C § 1132 (a)(1)(b)**
**CHANGE ACADEMY AT LAKE OF THE OZARKS**

56. Plaintiff incorporates by reference paragraphs 1 through 55 as though fully set therein.

57. Cigna breached its contractual, fiduciary, and statutory obligations to J.W. in its administration of the Policy with its denials of coverage for services rendered at Change Academy at Lake of the Ozarks ("CALO").

58. The Defendant's breaches include but are not necessarily limited to, the following:

    (a) Failing and refusing to authorize medically necessary treatment;

    (b) Failing and refusing to pay for medically necessary treatment;

    (c) Failing and refusing to follow APA guidelines in reviewing treatment authorization requests;

    (d) Failing and refusing to follow the applicable best practices in reviewing treatment authorization requests;

    (e) Using unqualified and improperly credentialed reviewers to consider authorization requests and appeals of authorization denials;

    (f) Applying erroneous and irrelevant standards in considering authorization requests and appeals of authorization denials;

    (g) Engaging in a pattern of conduct and behavior that discouraged, frustrated, limited and denied J.W. the benefits, and medically necessary treatment to which they were entitled;

  (h)  Employing a scheme that denied J.W. treatment and benefits to which they were entitled by rendering as moot or meaningless any determination or opinion of reviewers supporting the necessity of a higher level of treatment due to the existence of a broad policy supporting or requiring denials of authorization irrespective of J.W.'s medical needs or case specifics;

  (i)  Failing to administer the Policy in the interests of Policy beneficiary; and

  (j)  Via all its actions, depriving J.W. of the benefits they were entitled to under the policies at issue and applicable law.

Plaintiff has exhausted all administrative remedies required under ERISA

59. Cigna's actions in failing to provide coverage, authorize treatments and pay benefits for the treatments provided to J.W. violated the terms of the Policy.

60. In addition, Cigna breached its fiduciary duties when it failed to comply with its obligations under 29 U.S.C. § 1104 and 29 U.S.C. § 1133 to act for the exclusive purpose of providing benefits to Policy participants and beneficiaries when its agents failed to provide a full and fair review of J.W. denied claims.

61. The actions of Cigna as outlined above violated ERISA and constitute a breach of the terms and provisions of the Policy establishing the parties' rights and liabilities.

62. The actions of Cigna, as outlined above, has caused damage to J.W. in the form of denial of payment for medical services rendered to them.

63. Cigna is responsible for paying J.W.'s benefits due under the terms of the Plan, Together with prejudgment interest, attorney fees, and costs pursuant to 29 U.S.C. § 1132(g)(1) to the date of payment of the unpaid benefits.

**COUNT III**
**WRONGFUL DENIAL OF BENEFITS PURSUANT TO 29 U.S.C § 1132 (a)(1)(b)**
**EVOKE WILDERNESS**

64. Plaintiff incorporates by reference paragraphs 1 through 63 as though fully set therein.

65. Cigna breached its contractual, fiduciary and statutory obligations to J.W. in its administration of the Policy with its denials of coverage for services rendered by Evoke Wilderness, a Second Nature Entrada Therapeutic Program.

66. On January 30, 2019, Cigna upheld its previous coverage denial for services rendered at the Evoke Wilderness program from February 05, 2018 to March 02, 2018.

67. Evoke Wilderness is an LLC licensed in Santa Clara, Utah as an Outdoor Youth Treatment facility.

68. The denial letter stated that Evoke Wilderness was a facility only licensed as an Outdoor Youth Treatment program and not a residential program and therefore a review was denied as the program is not licensed for residential treatment.

69. Cigna does not typically include Outdoor Wilderness programs unless the array or intensity of services would meet the definition of a clinical residential treatment center.

70. Under Utah Rule R501-8, which governs licensing for outdoor youth programs, an "Outdoor Youth Program means a 24-hour intermediate outdoor group living environment with regular formal therapy including group, individual, and the inclusion of supportive family therapy."

71. Further, Rule R501-8 sets forth strict guidelines for staff, program requirements, and health requirements that require the utilization of a multidisciplinary team that includes

psychologists, psychiatrists, pediatricians, and licensed therapists who are consistently involved in the child's care.

72. Under Utah statute, Evoke Wilderness is required to meet the definition of a clinical residential treatment center and therefore meets the threshold requirements needed for a program to be considered "residential" under Cigna's policy.

73. Plaintiff has exhausted all administrative remedies required under ERISA

74. The actions of Cigna in failing to provide coverage, authorize treatments and pay benefits for the treatments provided to J.W. were in violation of the terms of the Policy.

75. In addition, Cigna breached its fiduciary duties when they failed to comply with its obligations under 29 U.S.C. § 1104 and 29 U.S.C. § 1133 to act for the exclusive purpose of providing benefits to Policy participants and beneficiaries when its agents failed to provide a full and fair review of J.W. denied claims.

76. The actions of Cigna as outlined above violated ERISA and constitute a breach of the terms and provisions of the Policy establishing the rights and liabilities of the parties.

77. The actions of Cigna, as outlined above, has caused damage to J.W. in the form of denial of payment for medical services rendered to them.

78. Cigna is responsible for paying J.W.'s benefits due under the terms of the Plan, Together with prejudgment interest, attorney fees, and costs pursuant to 29 U.S.C. § 1132(g)(1) to the date of payment of the unpaid benefits.

## COUNT IV
## BREACH OF FIDUCIARY DUTY PURSUANT TO 29 U.S.C. §1132(a)(3)

79. Plaintiff incorporates by reference paragraphs 1 through 78 as though fully set forth herein.

80. Pursuant to 29 U.S.C. § 1104, Cigna is a fiduciary of Plaintiff's Benefits Plan.

81. As a fiduciary, Cigna owed J.W. the duty of loyalty and is obligated to decide their claim for benefit coverages under the Plan.

82. Cigna denied coverage for both ViewPoint Center and CALO's services because they claimed the treatment was not medically necessary.

83. In the course of its denial, Cigna clearly stated that they believed a lesser degree of treatment was necessary, as stated in the denial letters dated October 12, 2018, and November 30, 2018. However, Cigna never paid or agreed to pay for the lesser treatment.

84. Cigna's failure to provide any medical benefits, especially the ones Cigna found to be medically necessary, is a breach of its fiduciary duty and its contractual obligations to Mr. Williams.

85. Even if it is found that Cigna correctly denied full coverage for J.W.'s residential treatment, Cigna has breached their contractual and fiduciary duties by not paying for the treatment that Cigna found to be necessary.

86. Because Cigna stated that a lesser amount of care was necessary, it is minimally required to pay for the treatments Cigna deemed necessary during their denials of J.W.'s claim.

87. The actions of Cigna, as outlined above, have caused damage to Mr. Williams in the form of denial of payment for medical services rendered to his dependent child.

88. Because of these damages, Cigna is responsible for paying J.W.'s benefits due under the terms of the Plan, together with prejudgment interest, attorney fees and costs pursuant to 29 U.S.C. §1132(g)(1) to the date of payment of the unpaid benefits.

## COUNT V
## Mental Health Parity Laws

89. Plaintiff incorporates by reference paragraphs 1 through 88 as though fully set forth herein.

90. At all times herein, §376.1550 of the Revised Missouri Statutes was in effect in the State of Missouri.

91. Section 376.1550 R.S.Mo. mandates that each health carrier that offers or issues health benefit plans must provide parity between the health benefits provided under group health plans and mental health benefits needed to treat mental illnesses.

92. At all times herein The Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA) was in effect under federal law.

93. The MHPAEA mandates that group health plans and health insurance issuers that provide mental health and substance use disorder (MH/SUD) benefits from imposing less favorable benefit limitations on those benefits than on medical/surgical coverage.

94. Cigna violated these laws by not providing mental health coverage comparable to the health benefits under the Plan.

95. The actions of Cigna, as outlined above, have caused damage to Mr. Williams in the form of denial of payment for medical services rendered to his dependent child.

96. Because of this damage, Cigna is responsible for paying benefits due under the terms of the Plan, together with prejudgment interest, attorney fees and costs pursuant to 29 U.S.C. §1132(g)(1) to the date of payment of the unpaid benefits.

**WHEREFORE**, Plaintiff Bruce Williams respectfully prays for judgment against Defendants as follows:

1) Grant judgment in his favor and against Defendant on all claims;

2) Order that Defendant pay all benefits due under the Plan from to the date of judgment, including interest thereon;

3) Declare Plaintiff's rights under the terms of the Plan, and clarify his rights to future benefits under the terms of the Plan;

4) Enjoin Defendant to provide a procedure for a full and fair review of adverse determinations under the Plan in accordance with 29 U.S.C. § 1133;

5) Enjoin Defendant to discharge its fiduciary duties in accordance with 29 U.S.C. § 1104;

6) Order restitution or surcharge to disgorge Defendant's unjust enrichment in wrongfully delaying and denying benefits and/or to make Plaintiff whole for losses, and payment of his attorneys' fees caused by Defendant' violation of 29 U.S.C. § 1133 and breach of fiduciary duty;

7) Order that Defendant pay the costs of suit, including Plaintiff's attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and

8) Award all such other and further relief as this Court deems just and proper.

**GALLAGHER DAVIS, L.L.P.**

*/s/ Mathew R. Davis*
Matthew R. Davis MO 58205
Adam J. Olszeski MO 66126
2333 S. Hanley Road
St. Louis, Missouri 63144
(314) 725-1780
Fax: (314) 725-0101
matt@gallagherdavis.com
adam@gallagherdavis.com
Attorneys for Plaintiff